May it please the Court, good morning and welcome to Southern California. I'm sure it's quite a change in weather from Michigan. It has been, thank you. I think the focus of this case being on firm resettlement has substantially changed in the last couple of years. And I think the Court should take administrative notice of what has happened in the last few years with regards to the revelations after Colombia invaded Ecuador to take out the FARC base there. And all of the information that has been uncovered with relation to Hugo Chavez's government in Venezuela and the FARC. All the support, the conspiracies that they have been involved in, the cross-training of military officers between the FARC and the Venezuelan military. Is this in the record, counsel? No, it's not. It's all happened since 2008. Then why isn't your appropriate remedy to make a motion to reopen before the Board? How can you come here and present new evidence to us that nobody at the BIA has looked at? Well, I'm doing it in the format of that this is all now public knowledge. You're asking us to take judicial notice of? Judicial notice of the changed circumstances. Judicial notice of what things? Is there anything in our record that we can take judicial notice of? Outside of the record, Your Honor. The CIA security, national intelligence security briefings in the Senate, they make clear that Hugo Chavez has been supporting the FARC, that he continues. If you want, I can cite because I have the security summaries with me this morning. This is from Director of National Intelligence, Dennis Blair, 12th of February, 2009. Chavez is likely to maintain his decades-long ties to the FARC by providing them with safe haven because of his ideological affinity to the group and his interest in influencing Colombian politics. Same briefing one year later, Chavez has continued his covert support of the terrorist Revolutionary Armed Forces of Colombia, FARC. And there's a simple Google search will yield lots of information from a variety of sources. Der Spiegel, the German language newspaper, has done very in-depth coverage on this and researched Hugo Chavez's ties with the FARC. And other media and information sources, even our infamous Julian Assange has, through WikiLeaks, published consular memos back to the United States saying that when Chavez was visiting Honduras, he was requesting the president of Honduras to take the FARC off the terrorist list in Honduras. Do you have anything that suggests that Hugo Chavez has been willing to allow the FARC to operate freely in his country to terrorize Venezuelan citizens and Venezuelan residents? Yes, there are reports, I believe in Columbia reports, an online news source that says that there are Venezuelans that the FARC, anyone who crosses the FARC, ends up suffering their wrath. And that is because Chavez is very much in support of the FARC. And as you can see from the own discord in his policies and within Venezuela... We're supportive of Canada, but we don't allow the Royal Canadian Mounted Police to mount raids into North Dakota. Correct. If Chavez is supportive of the FARC, does that mean that he allows the FARC to operate freely to terrorize Venezuelan residents in Venezuela? Yes, he, in fact, as I said, there are military training exercises. The generals of the Venezuelan army are often in the FARC camps. Hugo Chavez has the emails that were captured in Ecuador by the Colombian military show that... And none of this is in our record? None of this is in the record because it all happened since 2008 that this explosion... And do you want us just to go to Google and look for it ourselves? If it's there, yes. If the court suggests that I entertain or would entertain a motion to remand based on changed circumstances... Within this forum, I would certainly do that. I think that changed circumstances is the main thing in this case... Because at the end of the day, we still have the death warrant for Mr. Pena. And he's here with his family this morning in the front row. That isn't going to change. Whether there's peace accords or anything else, he has a death sentence published by the FARC... Naming him, that's at the record, I believe 298 to 299. And he fled from Colombia where the FARC has its main presence. But the problem now, as all these news reports have revealed... Is that the FARC is deeply tied with the Venezuelan government. So far so that the news reports, if you just do a simple search... Was that there was a conspiracy that was uncovered... That Hugo Chavez was going to give the FARC $300 million... Because that was the amount of money that they believed it would take... For the FARC to overrun the Colombian government and take over Bogota. And there was apparently a $50 million prepayment on that coming... At the time that the Colombians invaded Ecuador and raised tensions there. You know this law better than I do, probably, as to other issues regarding this case. But do you have the right to re-petition the board to determine... To look at these facts that you're asserting here for the first time? We could do procedurally. The one thing that we have is the right to do, in essence, a sua sponte motion to the board... Saying, look, there are changed circumstances since 2008 and Colombia's actions. Would that enable you to create a better record if they took that petition? The only problem with doing anything with the board right now... And even I was discussing the case with opposing counsel Mr. Hardy this morning... The one problem we have is that under Ninth Circuit law... You do not have any jurisdiction over a denial of a sua sponte motion. So if I make a sua sponte motion to the board and they deny me... I'm cut off from all judicial remedies, from any judicial review. That's why I hesitate to just do a motion to the board at this juncture... Because I believe the court taking administrative notice of the news that has come out... From the last two and a half years and remanding the case on its own... Based on the changed conditions, the new information that's come out... Seems, at least on my side, the safest and most logical way to proceed... Because there's no guarantee that the board is going to want to do anything. And like I said, there's no judicial review in case the board decides to ignore my evidence. And at the heart of it... That's where I think I'm going to leave you and give the floor to Mr. Hardy. Thank you, Mr. Hart. Mr. Hardy. Thank you, Your Honors. Good morning again, Mr. Wolfgang. And may it please the Court, Joe Hardy for the Attorney General. To begin with, everything that was just discussed is new evidence that's come up... After the board's August 2006 decision. Judge Quist, under the INA, the Pineas have a right, as the Supreme Court just noted in Kewkana... To file a motion to reopen. If it's based on changed circumstances, it gets around the jurisdictional requirements. Any motion based on the evidence that you just heard by my colleague... They have a right to file a motion to reopen based on changed circumstances. The board hasn't decided the court would have jurisdiction over that, assuming that the petition for review was timely. Based on what we have in this record, I would argue that substantial evidence supports... Let me understand. If they did that and the board denied his petition, that could be appealed, you're saying? That could definitely be appealed. That's different from what Mr. Wolfgang said, I thought. But no, no, I'm not... To be nice, that's incorrect. If you look at the Supreme Court's decision in Kewkana, it clearly says that aliens have a right to a motion to reopen. In fact, all of the evidence would be based on things that would recently have occurred, I guess, between Columbia and the Hugo Chavez government. And it would be based on changed circumstances. That's not a motion to reopen sua sponte, which comes under the regulations at HCFR 1003.2A. That comes under 1003.2C, which is a motion to reopen. Regardless of whether it's 90 days, it's still timely because it's a motion to reopen based on changed circumstances. Does that answer that question? Answered it for me. Okay. With respect to what we have here, substantial evidence supports the board's decision that Mr. Penea was firmly resettled in Venezuela. Can I ask you a question about that? Yes, ma'am. The CIA based its determination apparently on Chao, on the Chao presumption, and not on Maharaj. Maharaj, I believe, came out... A few months before. A few months before the board's decision. Yes. And the BIA didn't mention it, and apparently based its decision on Chao. Why shouldn't we let the BIA have the chance to look at this case in light of Maharaj? I don't think that, if I may, I don't think that the board relied on Chao, if I recall it. I don't even think the board... I think it did. And the BIA did not cite Tichao. Tichao, did it cite Tichao? Yes, it did. And it – the BIA made no findings with respect to whether the government had met its initial burden of showing. I think, well, it discussed that he had a – he admitted that he had legal residency. Well, but nobody has ever said that's sufficient. I mean, it may be, may not be. I'm sorry? I mean, the fact that he had legal residence may or may not be sufficient to meet the government's initial burden of showing an offer of permanent residence. Judge Reimer, I know Maharaj is your decision. If you note that Mr. Pania does not challenge that the government had met its burden in this case. I understand that. I'm just asking you your view. My view is that the case should stay here, one, because it was never argued to the agency. Any challenge of the government did not meet its burden under Maharaj or any of the cases that require an offer of firm resettlement if the alien was entitled to accept. That was never a challenge to the agency. If you note, his only challenge with respect to firm resettlement is that he did not resettle because of Andreagin, and Andreagin, any reliance on Andreagin is misplaced because that case, as you noted in Note 7 of Maharaj, that case was governed by 208.13d, which was removed by the Attorney General in January 2001. This case is governed by, as the court noted in Maharaj, 1208.15. Mr. Pania has never made any challenge under 1208.15 that he did not firmly resettle in Venezuela. His only challenge, as I say, was under Andreagin that basically because there were incidents in Venezuela that he did not firmly resettle. However, that is not the law in this court's case law as stated in Maharaj, and specifically as the plain language, it doesn't come under the plain language of 1208.15. So, no, the court need not do this. As I noted, and I trust you all have my 28J letter, it would also be futile. I mean, Mr. Pania has a cedula de identidad, and I'm sorry I took French. That's a Spanish word. It's a certificate of identity. We know from the record that he does have a number. In fact, the E denotes that he is a foreigner that has residency status. If it had begun with a V, it would note that he was a Venezuelan citizen. If you know from the wife and the children's birth certificates, they all have a V in front of it. So you actually get an idea that there is direct evidence in this record. You have the driver's license, you have the birth certificates, you have the marriage license, which all indicate that he has a residence number. Mr. Pania conceded that in 1980 he was granted legal residence and that the government constantly renewed it every five years thereafter. The fact that it's lapsed, and it appears that it lapsed in 2004. As I know from other cases, if you're outside of Venezuela for two years, it automatically lapses. However, that he let it lapse by going to Mexico and thereafter coming to the United States, as the court noted in Maharaj, has no bearing on the firm resettlement matter. Are there any other questions on firm resettlement? Do we know whether he has the right to return to Venezuela? I suspect that right now he does not have the right to return to Venezuela. That's something different. I'm not exactly sure if you're... Has the IJ designated a country of return? At the time, the IJ was correct in designating Venezuela as the country of removal. It was not challenged. Because if the IJ were now to say you have to go back to Colombia, then that invokes a whole different set of problems, doesn't it? He was granted withholding from Colombia, so he would not be going back to Colombia regardless, unless things changed in Colombia or if he committed a crime  Whether the... Whatever country that he goes to, if you look at the regulation, and I'll say it for the record, 1240.12d, if he cannot be removed to Venezuela, and I note that this is something that's different, the removal or where he's removal to is different from where DHS actually executes the order to. There are two distinct issues. But under 1240.12d, if the agency cannot remove him to, obviously, they're not going to remove him to Colombia. If we cannot remove him to Venezuela, the regulations permit the agency to remove him to wherever he has... To whatever country basically we'll be able to take him. But that's something very different than whether the agency got this decision correct. Substantial evidence also supports the agency's decision that he did not have a well-founded fear of persecution should he return to Venezuela. With respect to whether he had established past persecution, I would submit that this case is very similar to the Truon case that was decided last July. That appears at 613F3938. He had an alien there who had a Vietnamese alien who was in Italy. While he was there, he had received death threats over the phone by communists from his country. A few days later, he was shot at. And in each instance, he cannot describe who was... He specifically stated that he did not know who the assailants were. He shot at him while he was driving his car. He stated that he raised the issue with the police, but the police said that they could not do anything because they did not have any suspects because he didn't know who the assailants were. You have the same issue here. While they... We're not arguing that the FARC did not call his wife on that day. We do not know. He specifically said that the neighbor said the people who came to him, he did not know who they were. When he was shot at a few days later, he said he did not know who the aliens were or who the suspects were. When he reported the incident to the police, like any police or police here in L.A. County or anywhere, if they don't have any suspects, they can't do anything. So he has not established that the incidents that occurred were on account of a protected ground. The timing, though, is pretty coincidental, isn't it? If they get the call on one day and the next day, within two days, they've got somebody shooting at them. That's a pretty striking coincidence, if it's a coincidence. Well, the issue, I think, is, one, he's... I looked at Google Maps, and it looks like it's about 600 miles, that is, town. I believe it was Mariara was about... I see that my time is about to expire. I'd like you to answer. Okay. Mariara is about 600 miles away from Bucamaranda, which is where his mother was living and where he had issues with the FARC. If you look at the FARC letter, which appears at 299, at least as of October 2002, the FARC was still under the belief that he had lived in Bucamaranda. So, I mean, it's... While they may have known his telephone number, anyone can know your telephone number, they did not know, at the time that he was in Mexico, that he lived in Mariara, Carabobo State, Venezuela. So, I mean, that... I'm sure Venezuela is not... that it has its civil strife there, notwithstanding a somewhat stable government. But, I mean, it could have easily been just a robbery attempt based on what we know. He has to establish that the incident, one, we don't even know that they were committed by the FARC, and if it's just civil strife, that's not persecution. Two, we have no idea why the people who attacked him did it. So you have to also establish that it was on account of a protected ground. And three, simply that the Venezuelan government was not able to do something because they did not have any suspects does not mean that they were unwilling to control it. If you look at the country reports at page 255, and at the bottom of 255 and the top of 256, they specifically note that the only people who had been attacked, only incidents reported of attacks were of cattle rangers in the border states. As I note, Mariara is about, it's actually about 500 miles away from the Colombian border. It's about 600 miles away from Bucamaranga. As the board noted, he's far away from the border states there. And at the top of page 256, it notes that Chavez's government had sent nearly 2,700 troops specifically to the Colombian border to try to control the incidents there. So there's clearly evidence that Chavez, as much as we hear in the news that he's an unlikable person, that he does not want the FARC roaming freely, no matter how much he may agree with their Marxist principles. Are there any other questions? I think not. Thank you. Okay. For those reasons, I ask that you affirm the board's decision. Thank you. Mr. Gidhar. The Tron case that he refers to, I think the one distinguishing fact between the facts there and the facts in this case, is simply that we know that the Italian government is not in league with the very people that were persecuting this gentleman. We now know that the Venezuelan government, all the way up to the president, not just lower-level officials, are deeply tied with the FARC. And I think that changes things quite a bit, because even if you don't know who's following you and shooting up your car and whatnot, it's a different thing. If you seek protection from someone who is not affiliated with your persecutors, and if you go to a law enforcement agency that is affiliated with your persecutors. So on that issue, I think that there's definitely a distinguishing factor. And certainly on the issue of firm resettlement, Mr. Pena's Venezuelan residence has lapsed after five years. He does not have the right to return back to Venezuela. On the issue of the danger, the family again today wanted me to express to you how afraid they feel of returning. The mother whose life they feared for in the early 2000s when all this was happening, and she moved to northern Colombia, relatives here in the United States petitioned her so that she could come to the United States and get out of danger. The house in Venezuela that was surveilled and from which the assassination attempt took place, when relatives sold that house, the person who was unfortunate enough to buy it suffered numerous attempts on her life apparently because they thought he or some of his family members still lived there because the house was shot up several times. And right now, the family reconfirmed that the house is completely vacant because of the danger that the people who were living there afterwards, even though they had no relation to Mr. Pena, the FARC definitely knew that he did live there, it seems, and were continuing to shoot up that particular house. So their fear that they wanted me to express on their behalf is that going back for this family here could be a death sentence because the FARC has a death sentence on Mr. Pena's head, and nothing either in or outside of the record indicates that that death sentence has been withdrawn. And now that the Venezuelan government's ties with the FARC have been revealed to us through the series of events since 2008, it seems that firm resettlement is no longer an issue in this case, that it's just too dangerous for them. They feel the danger, and with the information that they continue to receive, because they're still living this case all these years later. Thank you very much. Have a very pleasant day, Your Honor. Thank you, counsel. The matter just ordered will be submitted.
judges: Quist, Rymer, Bybee